UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ENGINEERED STRUCTURES, INC., A CORPORATION OF IDAHO, an Idaho corporation, | Case No. 1-16-cv-00516-CWD |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut corporation, | |
| Defendant. | |

## INTRODUCTION

This case involves a dispute regarding the proper interpretation and application of a builder's risk insurance policy issued by Defendant Travelers Property Casualty Company of America ("Travelers") to Plaintiff Engineered Structures, Inc. ("ESI") ESI asserts claims for Breach of Contract, Negligence under Idaho's Unfair Claims Settlement Practices Act, and Breach of the Implied Covenant of Good Faith and Fair Dealing, and asserts also that it is entitled to a declaratory judgment against Travelers.

Both parties filed motions for summary judgment. (Dkt. 26, 30.) Travelers contends that coverage for ESI's claim is precluded under the insurance policy because the property damage and increased expense for which ESI makes its claim were the result of faulty workmanship, which is an expressly excluded cause of loss under the policy. Additionally, Travelers argues ESI's tort claims fail because the substantive law governing those tort claims is Oregon, not Idaho, and Oregon law does not permit the claims. ESI, on the other hand, argues the policy provides coverage for its losses, and that the faulty workmanship exclusion Travelers relies upon does not apply. As for its tort claims, ESI asserts Idaho substantive law governs, and therefore provides an avenue for recovery of its tort damages.

The Court conducted a hearing on May 8, 2018. After careful consideration of the parties' arguments, briefs and supporting materials, the Court will grant in part and deny in part each motion. Specifically, ESI's motion will be granted with regard to its breach of contract claim and contract damages, and Traveler's motion will be granted with regard to ESI's remaining tort claims, for the reasons explained below.

# FACTS[1]

Plaintiff ESI is an Idaho corporation, with its principal place of business in Idaho. Compl. ¶ 1; Ans. ¶ 1. Travelers is an insurer, incorporated in Connecticut, and is authorized to transact business in Idaho. Compl. ¶ 2; Ans. ¶ 2. The Court has jurisdiction over these proceedings on the basis of diversity of citizenship, as the amount in controversy exceeds $75,000.00. Compl. ¶ 3; Ans. ¶ 3.

## 1. The Policy Terms

On November 4, 2014, Travelers issued Policy Number QT-660-A154639-TIL-4, with effective dates of September 1, 2014 to September 1, 2015 (the "Policy") to ESI. (ESI SOF ¶4; TPC SOF ¶ 1.)[2] Included within the Policy is the CONSTRUCTION PAK – BUILDERS RISK COVERAGE FORM, Form CMT2210413 (the "Builders Risk Form"). (TPC SOF ¶ 2.)

The Builders Risk Form states as follows:

### A. COVERAGE
We will pay for direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss.

#### 1. Covered Property
Covered Property, as used in this Coverage Form, means the following types of property you own or for which you

---

[1] The parties each prepared statements of undisputed facts and responses thereto. Where facts are undisputed, the Court refers to the statement of undisputed facts (SOF) for the respective party as follows: ESI SOF or TPC SOF. ESI's SOF is located at Docket 34, and Traveler's response to the same is located at Docket 42-1. TPC's SOF is located at Docket 29, and ESI's response to the same is located at Docket 39-1. In addition, Travelers submitted supplemental facts 12 – 16 at Docket 42-1, to which ESI responded at Docket 44, referred to as TPC Sup SOF. Where facts are disputed, or there is a disagreement, the Court will cite to the relevant portion of the record, and will discuss whether the disagreement is material for purposes of the parties' motions.

[2] ESI submitted the entirety of the Policy, which can be found at Docket 33-1.

are legally liable, the value of which is included in the estimated "total project value" shown in the Declarations:

    **a. Permanent Works**

        Materials, equipment, machinery, supplies and property of a similar nature that will become a permanent part of the project described in the Declarations during completion of such project or that will be used or expended in the completion of such project. Completion of the project includes site preparation (including demolition of existing buildings or structures), fabrication, assembly, installation, erection, alteration, renovation and similar construction activities.

    **b. Temporary Works**

        Cofferdams, construction forms, cribbing, falsework, hoarding, scaffolds, fencing, signs, office trailers (and their "contents") and similar temporary buildings or structures incidental to completion of the project described in the Declarations.

  We will cover such property:

    (1) At the job site described in the Declarations;…

******

**3. Covered Causes of Loss**

Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is excluded in Section B – EXCLUSIONS.

**4. Coverage Extensions**

Each of the following Coverage Extensions applies unless *Not Covered* is indicated in the Declarations.

    **a. Expediting Expense and Extra Expense**

        (1) In the event of direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss, we will pay for the reasonable and necessary:

            **(a)** Expediting charges, including overtime, night work, work on public holidays, express and air freight, and the extra cost of rental construction equipment, you incur solely to expedite repair or replacement of the Covered Property sustaining such loss or damage.

            **(b)** Extra Expenses you incur during the period of restoration or repair of the Covered Property

sustaining such loss or damage that are over and above the total costs that would normally have been incurred during the same period of time had no loss or damage occurred. We will only pay for such expenses you incur for the purpose of continuing as nearly as practicable the scheduled progress of undamaged work.

Extra expense includes, equipment rental, emergency expenses, additional security, demobilization and remobilization of equipment and facilities, and temporary use of property, all when necessarily incurred to reduce time delays in the contract schedule.

* * * * *

**d. Soft Costs**

We pay for your "soft costs" during the "period of delay in completion." Such "soft costs" must result from direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss which delays the completion of the applicable project described in the Declarations beyond the "planned completion date."

*****

**5. Additional Coverages**

Each of the following Additional Coverages applies unless *Not Covered* is indicated in the Declarations.

**a. Additional Cost of Construction Materials and Labor**

We will pay for the following costs made necessary by a Covered Cause of Loss to Covered Property at the job site described in the Declarations:

**(1)** Your increased cost of construction materials and labor; and

**(2)** Your costs to make changes in construction specifications; when such loss or damage results in a total loss to Covered Property.

The Builders Risk Form sets forth the following exclusion for "faulty, inadequate or defective" work:

## B. EXCLUSIONS
* * *
4. We will not pay for loss or damage caused by or resulting from faulty, inadequate or defective:
   a. Planning, zoning, development, surveying, siting;
   b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction;
   c. Materials used in repair, construction, renovation, remodeling, grading or compaction; or
   d. Maintenance;
   of part or all of any property on or off the job site described in the Declarations.
   If an excluded cause of loss listed in Paragraph 4.a. through 4.d. above, results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss. But we will not pay for:
   (1) Any cost of correcting or making good the fault, inadequacy or defect itself, including any cost incurred to tear down, tear out, repair or replace any part of any property to correct the fault, inadequacy or defect; or
   (2) Any resulting loss or damage to the property that has the fault, inadequacy or defect until the fault, inadequacy or defect is corrected.

(TPC SOF ¶ 3.)

### 2. The Burlingame Fred Meyer Fuel Center Project

On September 29, 2014, ESI as Contractor and Fred Meyer Stores, Inc., as Owner entered into a contract (the Contract) to build the Burlingame Fred Meyer Fuel Center in Multnomah County, Portland, Oregon, which was to be a new multi-island fueling station and associated retail space (the Project). (TPC SOF ¶ 4; ESI SOF ¶1.)

The Contract for the Project included by reference a project schedule, general conditions, specifications and drawings. (ESI SOF ¶ 2.) All work was to be performed in accordance with the schedule, general conditions, specifications, and drawings. (ESI SOF

¶ 2.) The Project specifications were contained in the Project Manual, prepared by the

Project Architect, Anderson Wahlen & Associates. (ESI SOF ¶5.)

The Contract called for installation of two underground storage tanks ("USTs") for

storage and sale of fuel in the anticipated Fred Meyer fueling station. (TPC SOF ¶ 6.)

One UST had a 20,000-gallon capacity designed to hold regular unleaded fuel, and the

other was a split 18,000-gallon tank designed to hold both premium and diesel fuel. (ESI

SOF ¶ 8.) The 20,000-gallon UST is the one at issue in this case. (ESI SOF ¶ 8.)

ESI subcontracted with 3 Kings Environmental, Inc. ("3 Kings") to install the

Liquid Fuel Distribution & Electrical systems, a portion of which work included the

installation of the two USTs. (ESI SOF ¶3.) ESI and 3 Kings were required to do their

work in compliance with the Project Manual. (TPC SOF ¶ 13.) In mid-December of

2014, ESI and its subcontractors, including 3 Kings, began the process of installing the

two USTs on the Project. (ESI SOF ¶ 8.)[3]

There is a section in the Project specifications relating to the UST at issue in these

proceedings, Section 33 52 00 - Liquid Fuel Distribution. (ESI SOF ¶5.) General

Condition 00 72 14 – 3.7.3 to the Contract provides that the contractor is to comply with

the manufacturer's written instructions for installing products. (ESI SOF ¶ 6.) Similarly,

the Liquid Fuel Distribution specification 33 52 00 - 1.5 requires that the contractor

deliver, handle and install materials (including specifically the UST) in accordance with

the manufacturer's instructions. (ESI SOF ¶ 6.) Xerxes manufactured the USTs, and the

---

[3] There were several subcontractors involved with the installation of the USTs. ESI Response to TPC SOF ¶ 10 (Dkt. 39-1 at 2.)

Xerxes Installation Manual is the UST manufacturer's instructions referenced in the

Project Manual. (ESI SOF ¶ 7.)

With respect to installing the USTs, the Project Manual provided:

**3.2 TANK INSTALLATION**
* * *
E. Where permitted by authorities having jurisdiction. Owner
will furnish product for use as ballast. Notify Owner 48 hours
prior to required delivery of product to permit scheduling.
Where local regulations or authorities will not permit the use
of product as ballast, Contractor may, at his expense, use
clean potable water as ballast. Water shall be removed from
tanks prior to filling with product. Under no circumstances
shall water be pumped through the submersible pumps or any
portion of the product dispensing system. Owner assumes no
responsibility relative to the hold-down capacity of petroleum
product or water ballast. Any movement or floating of tanks
resulting from an accumulation of water in tank excavation
will require removal and reinstallation of tanks at
Contractor's expense.
* * *
G. Complete tank manufacturer's installation checklist form.

(TPC SOF ¶ 12.)

The Xerxes Manual contained the following "NOTICE: Adequately ballast the

tank (add liquid) in a wet hole or in a dry hole that may become wet (for example, from

site runoff) until the installation is totally completed. Failure to do this may result in

damage to the tank and/or surrounding property." (TPC SOF ¶ 18.) The Burlingame Fuel

Center Project was a "wet-hole installation." (TPC SOF ¶ 20.)

Concerning tank installation, the Xerxes Manual directed in part:

**12.1 GENERAL**
12.1.1. In most anchoring systems, a tank is not adequately
protected against flotation until the tank is fully backfilled
and the top slab is in place. Therefore, during the installation

> process, the tank should be ballasted completely after the backfill is at least 75 percent of the way up the tank and after post installation testing has been successfully completed.

(TPC SOF ¶ 19.)

Ballast is, by design, a temporary element of the installation work much like roofers use a tarp to cover an unfinished roof as the work progresses. (ESI SOF ¶ 15.) When the work is complete, and a finished product available, no water (ballast or otherwise) should be present in the tank. (ESI SOF ¶ 15.)

Between December 15 and 17, 2014, the USTs were lowered into a shored excavation, seated into bedding material, strapped down via anchor straps to deadmen (reinforced concrete beams) on either side of the USTs, and partially backfilled with pea gravel. (ESI SOF ¶ 9.) The backfill material was placed in the hole at least 75 percent of the way up the tank (TPC SOF ¶ 21.)

On December 23, 2014, it began to rain. On the morning of December 24, 2014, it was discovered by ESI and 3 Kings that the larger of the two USTs had displaced the surrounding soils and emerged from the excavation. (ESI SOF ¶ 21.) Approximately 1.85 inches of rain had fallen over the period of time that the UST was placed in the ground to the time it floated. Depo. of Adam McClure[4] at 46. (Dkt. 33-4 at 5.)[5] At that time, the backfill was at least up to the top of the tank. (TPC Sup. SOF ¶ 12.) By floating out of the backfill that surrounded it, the UST sustained damage, which required repair before the

---

[4] Adam McClure was Travelers' claims adjuster.

[5] The photograph of the UST taken at approximately 7:57 a.m. on December 24, 2014, depicts the UST coming out of the ground water like a submarine surfacing at sea. (Dkt. 28-7.)

UST could be reinstalled, and delayed the Project schedule. (TPC SOF ¶ 24.) As of the

date of loss, the UST was between stages; that is, the UST had been lowered into the

excavation and partially backfilled, but it had not yet successfully undergone post-

installation testing as required by the Xerxes Installation Manual. (ESI SOF ¶ 22.)[6] Also,

the ballasting of the tank was incomplete. (TPC SOF ¶ 27.) In other words, as of the date

of loss, the tank installation was incomplete, as was the Project as a whole---the fueling

station. (ESI SOF ¶ 23, ¶24.)

ESI incurred additional costs and expenses to re-excavate the hole and reinstall the

UST in the excavated hole. (TPC SOF ¶ 32.) It also incurred additional cost and expense

to have the UST inspected and repaired before it was reinstalled. (TPC SOF ¶ 32.) All of

the damage to the UST occurred because it floated. (TPC SOF ¶ 32.)

On January 6, 2015, ESI submitted a claim under its builders' risk policy with

Travelers for the loss and associated Project repairs, including reinstallation of the UST

and other resulting costs. (ESI SOF ¶ 25.) Specifically, ESI claimed damages for

"additional costs that it would not have incurred had there been no direct physical loss

and/or damage to the Project," in the amount of "$177,431.99." (TPC SOF ¶23.)

---

[6] Travelers's statement of material facts in opposition to ESI's motion did not expressly refute ESI's SOF ¶ 21. (Dkt. 42-1 at 3.) Travelers then cited to an email drafted December 11, 2014, which contained a list of the steps required to complete the project. "With respect to the UST installation it stated: 'Monday December 14, 2015 --- receive fuel tanks, air test the fuel tanks, set the fuel tanks in the hole, back fill tank hole and ballast fuel tanks." (Dkt. 42-1 ¶ 11.)

Travelers engaged Vertex Companies, Inc., to assist Travelers with determining a cause of loss. (ESI SOF ¶ 26; Traveler's Response.)[7] On February 24, 2015, Vertex issued a report to Travelers regarding its investigation of the loss ("Vertex Report"). (ESI SOF ¶ 27.) The Vertex Report indicated that, based on available meteorological data, the loss appeared to have been caused by an elevated water table due to recent, substantial precipitation; and the Xerxes UST installation procedures provided that the subject UST should have been filled with ballast, to a level of not more than 12-inches above the groundwater level in the excavation, following installation and partial backfilling. (ESI SOF ¶ 28.) The ballast was required to increase the weight of the UST and minimize the risk of tank buoyancy until the UST was completely backfilled. (ESI SOF ¶ 28.)

According to the Vertex Report, there was a disagreement between ESI and its subcontractor, 3 Kings, as to the amount of ballast in the USTs at the time of the loss on December 24, 2014, and it was "unclear how much, if any, ballast was delivered to the subject UST." (ESI SOF ¶ 28.)

The parties disagree regarding how much ballast was actually in the UST, and how much ballast was required to be in the UST, prior to the date of loss on December 24, 2014. Rob Law, who oversaw the project on behalf of Fred Meyer,[8] indicated he had

---

[7] The parties dispute ESI's description of Vertex as Travelers' expert. Nonetheless, there is no dispute Travelers hired Vertex Companies, Inc. to assist it in determining the cause of loss, and Vertex provided a report regarding its investigation.

[8] The parties dispute Rob Law's role, with Travelers indicating he oversaw the project, while ESI claiming he was simply the owner's representative. (TPC SOF ¶ 14; ESI's Response to TPC SOF.) The dispute is not material.

inspected the site over the course of the installation of the USTs on December 15, 16, and 17, 2014. Depo. of Law at 46. (Dkt. 33-5 at 2.) Law's Tank Installation Checklist, dated December 15, 16, and 17, 2014, indicated that the tanks had been placed on an approved backfill bed, and "backfill was placed in 12" lifts and hand tamped and compacted to fill all voids around tank." (Dkt. 28-5.) According to Law's notes from December 17, 2014, he instructed someone (either from ESI or 3 Kings) to "complete ballasting, and ballasting means completely filling the tank." *Id.* at 48. (Dkt. 33-5 at 2.) Law's Tank Installation Checklist noted the following: "Tank is completely ballasted after backfill is even with the top of the tank – No…..Overall Comments: Complete Ballasting." (Dkt. 28-5.) Law understood that "they weren't completed with ballasting," which was a component of the installation process, and as of December 17, 2014, the tank installation was not yet finished. *Id.* at 79, 83, 84. (Dkt. 33-5 at 3, 5.)

According to Brandon McCurdy, ESI's Project Manager in charge of the Burlingame Fuel Center, the 20,000 gallon UST was about half filled with water as ballast (about 10,000 gallons). Depo. of McCurdy at 15-16. (Dkt. 33-2 at 2.) 3 Kings' Daily Field Activity Log dated December 15, 2014, indicated: "Guy asked about Ballast, I asked Rob with Kroger how much he wanted in Tank. He pointed at Guys water tank on site. 3 loads of water in Tank." (Dkt. 33-12.)

Jonathan Noris[9] testified that, at the time of the loss, there was no evidence that post-installation testing had been completed. Depo. of Noris at 43. (Dkt. 33-6 at 3; ESI

---

[9] Jonathan Noris was the Senior Forensic Engineer employed by Vertex, and he authored the Vertex report upon which Travelers relied. (Dkt. 33-13 at 5.)

SOF ¶ 20.) Post-installation testing included soaping the fittings to ensure the UST could hold pressure. Depo. of Noris at 47. (Dkt. 33-6 at 4.) Xerxes Installation Manual § 13. (Dkt. 28-3 at 6.) Specifically, the Xerxes Manual indicated that the installer is to "soap all service fittings and manways on the top of the tank. NOTE: If the tank is ballasted with water, the tank can be pressurized for air testing. See POINT 13.2.3." Xerxes Installation Manual § 13.2.3.1. (Dkt. 28-3 at 6.) In addition, the Vertex report indicated that, as of December 15, 2014, the "excavation was partially backfilled. The UST was not completely backfilled because product conveyance piping on top of the tank was going to be installed at a later date." (Dkt. 33-13 at 2.)

Travelers contends, however, that post-installation testing had already been completed as part of an alternate procedure Xerxes had approved, and relies upon Law's installation checklist. (Dkt. 28-5 at 1-4.) The checklist contains a section entitled "Pre-Installation Testing," indicating the tanks had undergone a visual inspection and an air test. (Dkt. 28-5 at 2-3.) However, Ron King, President of 3 Kings, testified that Section 13 of the Xerxes Manual required that, after the UST was partially backfilled but before it was completely ballasted, it had to be pressurized, the fittings soaped, and then checked for leaks. Decl. of King ¶¶ 7-9 (Dkt. 32-2.) Once the integrity of the tank and fittings were confirmed, the tank could then be completely backfilled and ballasted. *Id.* ¶ 10.

In Travelers' February 25 and March 12, 2015 letters denying coverage for ESI's claim, Travelers relied entirely on the exclusion for faulty workmanship. The letters explained in part: "The referenced Builders' Risk policy does not cover the faulty, inadequate or defective-planning, workmanship or construction involved in properly

installing the fuel tanks. After a thorough investigation it was determined that the subcontractor did not follow installation specifications from the fuel tank manufacturer relating to the amount of ballast to be used…." (TPC SOF ¶ 29; Dkt. 28-10 at 3.)

3 Kings later sued ESI in the Circuit Court of the State of Oregon, for the County of Multnomah, on April 29, 2015, bringing claims for foreclosure of construction lien, breach of contract, quantum meruit, and private prompt payment. (Dkt. 43-14.) 3 Kings claimed it was owed the sum of $238,713.03. ESI and 3 Kings entered into a settlement agreement of 3 Kings' claims on February 12, 2016. (Dkt. 43-15.) As part of the settlement, the parties agreed to execute a joint prosecution agreement to recover monetary damages related to the Burlingame Project, and ESI agreed to pay to 3 Kings any and all money it might receive from Travelers under the all-risk Policy on account of the prosecution of its claims. The joint prosecution agreement provided that ESI and 3 Kings would agree to jointly prosecute all claims against Travelers relating to the "Float Incident," and cooperate in the same. (Dkt. 43-16.) This lawsuit followed.

## ANALYSIS

### 1. Standard of Review

#### A. *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 provides, in pertinent part, that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

For summary judgment purposes, an issue must be both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation; an issue is "genuine" if it must be established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)); *see also British Motor. Car Distrib. v. San Francisco Auto. Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir. 1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When parties submit cross motions for summary judgment, a court must independently search the record for factual disputes. *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross motions for summary judgment "where both parties essentially assert that there are no material factual disputes" does not vitiate a court's responsibility to determine whether disputes as to material facts are present. *See id*.

In considering a motion for summary judgment, a court does not make findings of fact or determine the credibility of witnesses. *See Anderson*, 477 U.S. at 255. Rather, it must draw all inferences and view all evidence in the light most favorable to the

nonmoving party. *See Matsushita*, 475 U.S. at 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008).

**B.    *Standard for Interpreting Insurance Contracts***

Idaho courts construe insurance contracts by their plain, unambiguous language;[10] but where the insurance contract is ambiguous, it must be construed in a light most favorable to the insured and in a manner providing full coverage for the indicated risks, rather than narrowing its protection. *See Axis Surplus Ins. Co. v. Lake CDA Dev.*, No. CV–07–505–E–BLW, 2008 WL 4238966, *2 (D. Idaho 2008) (citing *Cascade Auto Glass, Inc. v. Idaho Farm Bureau Ins. Co.*, 115 P.3d 751 (Idaho 2005)). "In construing an insurance policy, the Court must look to the plain meaning of the words to determine if there are any ambiguities." *Id.* This determination is a question of law for the Court, and the Court must construe the insurance policy as a whole, not by isolated phrases. *Id.*

Like other contracts, insurance policies are ambiguous if they are reasonably subject to conflicting interpretations. *Id.* If so, the meaning is controlled by the underlying intent of the parties. *See Mintun v. Blades*, 2008 WL 711636, *16 (D. Idaho 2008) (citing *Navarette v. City of Caldwell*, 949 P.2d 597 (Idaho Ct. App. 1997)). Intent is a question of fact, to be determined by the factfinder; in contrast, if a contract is unambiguous, the determination of the contract's meaning and legal effect is a question of law. *Id.*

_____

[10] The parties agree Idaho law governs the interpretation of the policy itself, because the insurance policy was obtained in Idaho.

"The burden is on the insurer to use clear and precise language if it wishes to restrict the scope of coverage and exclusions not stated with specificity will not be presumed or inferred." *Clark v. Prudential Prop. & Cas. Ins. Co*., 66 P.3d 242, 245 (Idaho 2003). However, standardized contract language must necessarily be somewhat general, in anticipation of varying circumstances of the facts. *Foster v. Johnstone*, 685 P.2d 802, 806 (Idaho 1984). "[W]here the policy language is clear and unambiguous, coverage must be determined, as a matter of law, according to the plain meaning of the words used." *Cascade*, 115 P.3d at 754 (internal citation and quotation omitted).

2.      **Coverage Under the Policy**

ESI's first cause of action alleges Travelers breached its contractual duty to pay ESI's claim pursuant to the terms of the Policy. In its motion, Travelers contends the faulty workmanship provision (Exclusion B.4) precludes ESI's claim, because had it not been for ESI's and 3 Kings' failure to properly ballast the UST, it would not have floated out of the ground. Travelers contends that, under either a "flawed product" or "flawed process" analysis, the faulty workmanship exclusion precludes coverage for ESI's claim. For its flawed product analysis, Travelers contends there was a defect in the workmanship of the UST, because it floated instead of remaining submerged. Alternatively, Travelers argues that the failure to fully ballast the tank once the backfill reached the top of the tank constituted a flawed installation process. Under either argument advanced, Travelers's position is that ESI was negligent and breached the standard of care, because ESI did not properly ballast the tank once it was backfilled.

In response, ESI claims the faulty workmanship provision does not apply to a work in progress, because the provision is meant to apply to a finished work product. Because neither party disputes that the work was unfinished, ESI contends summary judgment in its favor is warranted. In addition, ESI argues that it followed the requisite steps to complete the installation as prescribed by the Xerxes Project Manual, but that it was not finished with the post-installation testing at the time the UST floated. ESI contends Section 12 of the Xerxes manual requires post installation testing prior to completely filling the tank with ballast. Travelers argues to the contrary—that Xerxes had allowed testing to occur at an earlier time, and testing did not need to be repeated.

Despite the dispute regarding the water level in the tank necessary for ballast at the time of the float incident, and the sequence of testing for leaks, the Court finds the disputes immaterial.[11] There is no dispute between the parties that the work was incomplete, because ESI, and in turn 3 Kings, had not completed ballasting the tank, nor completed the subcontract for the installation of the Liquid Fuel Distribution & Electrical Systems and the fueling station as a whole. Under these facts, and in accordance with the persuasive authorities discussed below, the Court finds the faulty workmanship exclusion does not apply.

The Ninth Circuit Court of Appeals had the occasion in *Allstate Ins. Co. v. Smith*, 929 F.2d 447 (9th Cir. 1991), to examine an almost identical insurance policy exclusion

---

[11] Additionally, there is some uncertainty among the facts in the record as to the level of the backfill. Based upon the two statements Travelers submitted, it was "at least 75 percent" of the way up the tank, to "up to the top." This discrepancy also is not significant, as the Court will explain.

for faulty workmanship. In *Allstate*, Smith rented space in an office building. He purchased an "all risk" insurance policy from Allstate covering his property for loss or damage resulting from direct physical loss, with certain exclusions for losses caused by faulty workmanship. A roofing contractor was working on the building, and after having removed most of the roof, he forgot to place a temporary cover on the roof. That night, it rained, damaging Smith's office and equipment.

The district court ruled Allstate had no duty to reimburse Smith under the faulty workmanship exclusion. The Ninth Circuit disagreed, finding the term "faulty workmanship" ambiguous and susceptible to "at least two different interpretations: (1) the flawed quality of a finished product, or (2) a flawed process." *Allstate*, 929 F.3d at 449. The court explained that, under the flawed product interpretation, the failure to cover the roof with a tarp would not constitute faulty workmanship, because the roofer had not completed any portion of the new roof at the time the damage occurred, and there was therefore "no object to evaluate to determine whether the workmanship was faulty." *Id.* On the other hand, the court noted that the failure to place temporary cover on the incomplete roof could constitute faulty workmanship under a flawed process interpretation. *Id.*

However, the court did not express any view as to the soundness of the flawed process interpretation, because the court concluded that the flawed product interpretation was the more reasonable one, given the language of the policy as a whole, and it was the interpretation that favored the insured. *Id.* at 449-50. The Court explained that, if the broader flawed process interpretation was accepted as the only reasonable interpretation

of the policy, the "'ensuing loss' language is seemingly rendered meaningless." *Id.* at

450. In adopting the flawed product definition of "workmanship," the court noted that

numerous cases existed where faulty workmanship was found based on a defect in the

object of the workmanship. *Id.* (citing as examples *Tzung v. State Farm Fire & Casualty

Co.*, 873 F.2d 1338 (9th Cir. 1989) (defectively constructed apartment building); *U.S.

Indus., Inc. v. Aetna Casualty & Sur. Co.*, 690 F.2d 459 (5th Cir. 1982) (defective steel

tower); *Kroll Constr. Co. v. Great Am. Ins. Co.*, 594 F.Supp. 304 (N.D. Ga.1984) (poorly

waterproofed walls)). Accordingly, under the flawed product interpretation, the court

concluded the exclusion did not apply because the loss was not caused by a flawed

product, but "by failure to protect the premises during the roof repair process." *Id.*[12]

The Idaho Supreme Court had occasion also to examine a faulty workmanship

exclusion in a homeowner's insurance policy. *Fisher v. Garrison Prop. & Cas. Ins. Co.*,

395 P.3d 368 (Idaho 2017). In that case, Fisher decided to sell her house, and she entered

into a purchase and sale agreement with Reynoso. The agreement included a provision

that, until he obtained financing, Reynoso would lease the property, and that during the

lease term, Reynoso intended to "make certain improvements to the property upon

possession, with the intent to sell the property for a profit which might be prior to the end

of the lease period." Instead, Reynoso demolished the house and abandoned it. The

---

[12] The Court in *Hamilton v. Assoc. Indem. Corp.*, No. CV-07-141-N-BLW, 2008 WL 711375 (D. Idaho Mar. 14, 2008) cited *Allstate* and applied its approach to a matter involving an insurance policy exclusion for "faulty maintenance."

insurer denied Fisher's claim under the defective work exclusion, which included an exclusion for faulty, inadequate or defective workmanship.

The Idaho court found that the term workmanship had a plain, ordinary meaning. "The word 'workmanship' as a noun means: 1) the art or skill of a workman; 2) the art or skill with which something is made or executed; 3) the degree of art or skill exhibited in the finished product; or 4) the piece of work so produced." *Fisher*, 395 P.3d at 373. The court found that the loss to the house was not caused by Reynoso's lack of skillfulness or expertise in doing his work, as the house had been demolished and no work had actually been done other than some rough framing. *Id.* Consequently, the court found the faulty work exclusion did not apply to the loss. *Id.* at 374-75.

The Court finds *Allstate* and its reasoning, as well as that in *Fisher*, persuasive here in light of the policy language as a whole, and the facts before the Court. Travelers' argument—that under either the flawed finished product or flawed process interpretation the loss is excluded—is not only strained, but illogical. The Court assumes insufficient ballast was in the UST at the time of the loss.[13] However, the Court fails to see the distinction Travelers attempts to make between the failure to place a tarp over an exposed roof, and ESI's failure to adequately ballast the UST. In both cases, the risk of not adequately protecting the progress of the work is known. If a roofer fails to cover an

---

[13] By making this assumption, the Court does not need to resolve the dispute about how much ballast should have been in the tank at the time of the loss. The Court simply assumes that the ballast in the UST was insufficient, regardless of the quantity or the directives in the Xerxes manual indicating how much ballast should be in the tank at any stage during the installation process. Accordingly, the dispute concerning the completion of post-installation testing, and when that should have been completed, is not material.

exposed roof, one can imagine all sorts of perils that could befall the interior of a structure left exposed to the elements—rain, snow, hail, debris, and pollution are but a few. Similarly, if ballast in a UST is insufficient, the UST is at risk of floating out of the hole prior to completion of the installation process.

The Xerxes manual explained, in no uncertain terms, that until the tank was fully backfilled and the top slab in place, the tank would not be adequately protected against floatation. There is no dispute that ESI and its subcontractor, 3 Kings, were in the process of installing the UST and filling it with water for ballast, but because of the rain storm the night before, the ballast was insufficient to prevent the tank from floating.[14] The evidence in the record indicates that Rob Law instructed ESI or 3 Kings to "finish ballasting," meaning they were not done yet with filling the UST with water for ballast. Accordingly, and contrary to Travelers' argument, there was no "object to evaluate," because the installation of the UST was not complete, and would not be complete until the tank was fully backfilled and the top slab was put in place. To identify the faulty workmanship as "the workmanship of the UST—it floated instead of remaining submerged" is nonsensical. The UST is simply a component part of the project to be completed, much like installing shingles on a roof or a fireplace insert in a hearth.

Just as in *Allstate* (and in *Fisher*), interpreting the clause "faulty workmanship" as the flawed quality of the product worked upon—in this case, the liquid fuel distribution

---

[14] There is no evidence or opinion in the record whether the UST would have floated had the rain not occurred the night before the date of loss. However, there is no dispute that after December 17, and before the float incident on December 24, the UST did not float and remained seated in the hole.

and electrical systems of the Burlingame fuel center—makes sense in light of the policy language as a whole. For instance, in the coverage section, the Policy provides that coverage extends to Covered Property, defined as "supplies and property of a similar nature that will become a permanent part of the project described in the Declarations…or that will be used or expended in the completion of such project." Policy Section A(1)(a). (Dkt. 33-1 at 20.) The same section defines completion to include "site preparation (including demolition of existing structures), fabrication, assembly, installation, erection, alteration, renovation and similar construction activities." *Id.* Covered property therefore encompasses supplies or property not yet fully installed, and the processes necessary to install the same.

Here, the UST fits squarely within the definition of Covered Property—it is a "supply or property of a similar nature" that will become a permanent part of the liquid fuel distribution and electrical systems, and in turn a component part of the Burlingame fuel center, much like a roof on a house. Completion of the Project encompassed the installation of the USTs as part of the assembly or installation of the liquid fuel distribution and electrical systems. Coverage also extends to "labor, material and equipment charges incurred to move, remove, place or otherwise handle cut, fill and backfill materials to the extent such costs are included in the estimated 'total project

value' shown in the Declarations." Policy Section A(2)(c)(2). (Dkt. 33-1 at 20.)[15] The

Policy was therefore intended to cover all of the component parts, including the USTs,

and the excavation work and fill incorporated into the Project prior to its completion.

Elsewhere in the Policy, it explains that, in the event of damage to Covered

Property, Travelers will pay for the reasonable and necessary costs to repair or replace

Covered Property, and the extra expenses incurred during the period of restoration. Policy

Section A(4)(a)(1). (Dkt. 33-1 at 21.) Put differently, Travelers agreed to compensate its

insured for loss or damage to any supplies or property that were intended to become a

permanent part of the project, as well as expenses incurred during restorative work.

Also similar to the facts in *Allstate*, the flawed product interpretation is bolstered

by the language of the faulty workmanship exclusion itself. The court in *Allstate* provided

an example of a situation where a flawed product—*i.e.* a finished roof—could cause

damage to the structure or its contents. *Allstate*, 929 F.2d at 450. For example, the roofer

could neglect to install flashing,[16] allowing water to intrude. In such a case, the water

damage would be a resulting or ensuing loss covered by the policy, but repairing the roof

by installing flashings would not be covered. *Id.* Similarly, one can imagine if 3 Kings

completed the liquid fuel distribution and electrical systems, but neglected to test the

---

[15] The backfill and excavation clause is actually an exception to an exception – the Policy indicates covered property does not include cut, fill and backfill materials that existed at the job site prior to the date construction commenced, with the exception of backfill materials, labor, and equipment that is part of the scope of work. There is no dispute here that the Project required extensive excavation and dirt work.

[16] Flashing is material – usually aluminum or galvanized steel – used over joints in roof and wall construction to prevent water seeping in and causing damage.

UST fittings, causing a fuel leak after the top slab was in place, but prior to completion of the project as a whole. Presumably, damage caused by the leak would be a resulting loss, but the costs to repair the source of the leak would not be covered.

And finally, although not discussed in detail, ESI noted the rain exclusion may apply to support its position. The rain exclusion in the applicable amendatory endorsement excludes coverage for loss or damage caused by "[r]ain, snow, sleet or ice, whether driven by wind or not. This exclusion applies only to <u>personal property</u> left in the open." Rain Endorsement. (Dkt. 33-1 at 49, emphasis added.) Rain, therefore, is a covered cause of loss if it impacts Covered Property, which is all property and component parts required to complete the liquid fuel distribution and electrical systems, and the fueling station as a whole. Vertex, the company Travelers hired to assist it in determining a cause of the loss, indicated the loss appeared to have been caused by "an elevated water table due to recent, substantial precipitation," *i.e.*, rain. At the time Travelers denied the claim, neither Travelers nor Vertex knew how much ballast was in the UST, but there is no dispute that some amount of ballast had been pumped inside.[17] In other words, rain caused the loss, regardless of how much or how little ballast was in the UST.

Travelers attempts to equate the facts of this case with those of the faulty tower in *U.S. Industries, Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459 (5th Cir. 1982), and distinguish *Allstate*. In *Aetna*, plaintiff Wyatt Industries had contracted to fabricate and

---

[17] Various reports indicated three truckloads had been delivered, and witnesses indicated it was half-full.

erect a steel cylindrical tower, 240 feet high and 15 feet in diameter. Aetna issued an "all risks" policy, with an exclusion for loss or damage caused by or resulting from faulty workmanship. The construction of the tower involved welding semi-circular steel plates into twenty-one rings, placed on top of one another to the height of the tower. The welding process, however, was faulty, and the evidence showed that excessive and uneven heating caused deformation of the tower during the first phase of construction. Wyatt sought damages for the cost of materials and labor used to replace the tower when it became deformed due to the faulty welds. The issue was whether the cause of the damage was faulty workmanship, or was instead in the nature of a covered fortuitous occurrence, even if it resulted from the negligence of Wyatt's employees. *Aetna*, 690 F.2d at 460.

The court in *Aetna* explained that the faulty workmanship in the welding process caused the finished portions of the tower to be deformed. *Id.* The welding process was defective such that the tower itself became damaged during phase one of the project, and therefore there were no resulting, covered losses, which could have occurred had the tower fallen and hit something else. The court distinguished the case before it from a situation where errors in workmanship contributed to the cause of loss, but the loss essentially resulted fortuitously from events extraneous to the construction process itself. *Aetna*, 690 F.2d at 462 (citing *Equitable Fire & Marine Ins. Co. v. Allied Steel Construction Co.*, 421 F.2d 512, 514 (10th Cir. 1970) (pipeline being installed across a river fell into the river because the workman had replaced a fitting at one pier without securing the pipe at the other pier); and *City of Barre v. New Hampshire Ins. Co.*, 396

A.2d 121, 122 (Vt. 1978) (gust of wind blew arches down because insured contractor had installed only two guy wires, where six were required by the plans)). In both *Equitable* and *City of Barre*, the courts declined to apply the faulty workmanship exclusion, because the loss resulted fortuitously, even though there were errors in judgment during the construction process. *Aetna*, 690 F.2d at 462.

In its argument, Travelers equates the insufficient ballast to a defect in the way some part of the property—in this case the liquid fuel distribution and electrical systems—was constructed. However, in doing so, Travelers overlooks the facts presented here. Just like in *Allstate*, *Equitable,* and *City of Barre*, errors in workmanship during the course of construction contributed to the cause of loss. Here, it was the insufficient ballast.[18] But, Travelers' argument overlooks the heavy rain that fell on the night of December 24, 2015, which is no different than the fortuitous events in *Allstate* (rain falling on an uncovered roof), *Equitable* (the fall into the river by the failure to secure the pipe), and *City of Barre* (a gust of wind). In contrast, there was no fortuitous event in *Aetna*.

If Travelers's intent was to exclude liability from all losses caused by negligence on the part of ESI, it was not clearly expressed in the Policy. Instead, the Policy, construed as a whole, excludes coverage for damage resulting from defective materials incorporated into the structure itself, or from defects in the product caused by faults in the

---

[18] As stated previously, however, no one offered an explanation for why the UST remained unmoved after the ballast was pumped it, and for the eight days before the flotation event. Travelers confirmed at the hearing that it was likely due to a lull in the rain.

construction process. However, the Policy covers resulting loss or damage, which may have been caused in part by the negligent practices of the contractor during the construction process. If construed otherwise, there would be no coverage under the Policy, and coverage would be illusory.

In light of the facts of this case, the Court finds the term faulty workmanship ambiguous, and applies the construction most favorable to the insured. *Allstate*, 929 F.2d at 450. The UST sat in the ground without incident from the time it was filled with ballast on December 17 until December 24, when it rained. Under the flawed product interpretation, the exclusion does not apply because ESI's losses were not caused by a flawed product, but by failure to adequately protect against flotation during the installation of the USTs, which installation was a component part of the completion of the liquid fuel distribution and electrical systems for the Burlingame fuel center.

Accordingly, ESI's motion for summary judgment on its first cause of action for breach of contract will be granted, and Travelers' corresponding motion will be denied.

### 3. Damages

ESI argues the Policy covers resultant damages and ensuing losses, and claims also entitlement to attorney fees under Idaho Code § 41-1839.[19] ESI asserts its contract damages are reasonable, noting Travelers did not contest its cost data or refute the amount of damages ESI claimed.[20] Travelers does not contest either the amount of

---

[19] ESI concedes it is not seeking punitive damages, thereby waiving its intent to seek such damages in its complaint.

[20] ESI claimed damages in the amount of $177,431.99.

damages claimed, or the reasonableness of the amount, but rather claims ESI is not entitled to damages at all because ESI breached the conditions of the Policy by entering into a settlement agreement and joint prosecution agreement with 3 Kings. Travelers claims the policy precludes the transfer of rights and duties under the Policy without its written consent. ESI counters that Travelers' own notes indicated the assignment of the claim was not an issue, and that its settlement agreement with 3 Kings did not effect a transfer of rights under the Policy. Rather, ESI notes the settlement agreement contained a joint prosecution clause, not an assignment. And finally, ESI asserts Idaho law holds that a non-assignment provision in a policy only prohibits an assignment pre-loss, citing *Hartman v. State Farm*, CV03-06793 (1st Dist. Kootenai Cty. 2004).[21]

The Court finds that ESI's costs to remediate the UST floatation by repairing the outside of the UST, excavating the hole, re-setting the UST, and backfilling constitute charges to repair or replace "Covered Property" under the terms of the Policy. Here, the covered property, as explained above, constitutes the labor and materials necessary to construct the liquid fuel distribution and electrical systems. Such costs include "soft costs," such as overhead, or expenses due to completion beyond the planned completion date. By identifying the defect as the lack of ballast, Travelers cannot exclude the resulting damages arising from that defect. Much like a tarp that was not placed over a hole in a roof during the course of construction, it did not cost anything to "repair" the

---

[21] The parties did not provide the Court with a copy of this case, which was decided by the state trial court, for the Court's review. State district court cases in Idaho are not available via internet research platforms.

insufficient amount of ballast. Put in another context, the Policy is designed to cover the loss caused by a leaky faucet, but it would not cover the cost to replace the faucet itself. Here, all of the damages were a result of the UST floating out of the hole due to insufficient ballast to counteract the rain that fell during the night.

Turning now to Travelers' arguments regarding entitlement to damages, Travelers first relies upon the following policy provision:

> **J. Transfer Of Rights Of Recovery Against Others to Us**
> If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them.

(Dkt. 33-1 at 18.)

Travelers' reliance upon the policy provision cited above is in error. The policy provision cited is contained within a discrete portion of the Policy, applicable in Commercial Inland Marine Coverage Forms. (Dkt. 33-1 at 17.) According to Travelers' website, Inland Marine insurance "provides protection for a business' property that is mobile in nature or requires unique valuation. Coverage extends to property that is owned or in a business' care related to construction…. We provide protection for fixed property under construction and equipment used during construction, whether it is in transit, in storage or at the jobsite." https://www.travelers.com/business-insurance/inland-marine (last visited June 18, 2018).[22] Inland marine insurance is a different insurance product,

---

[22] A copy of the website visited is attached as Exhibit A.

and is meant to cover property such as tools and equipment that travel with employees to various job sites.

The language of Subsection J clearly restricts the clause to "payment under this Coverage Part," meaning it falls within the inland marine provisions, not the Builders' Risk Coverage Form. And, in the first paragraph to the Commercial Inland Marine Conditions, it clearly indicates that the provisions contained therein apply "in addition to the Common Policy Conditions … in Commercial Inland Marine Coverage." In other words, the commercial inland marine conditions supplement the other coverage conditions, but do not extend to other types of coverage provided under the Policy.

The other policy provision Travelers cites is contained within the Common Policy Conditions, and states:

> **F. Transfer Of Your Rights And Duties Under This Policy**
> Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.
> If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

(Dkt 33-1 at 6.) The provision speaks in terms of assignment of the rights and duties under the Policy, not the transfer of a claim, or right to payment. And, that is precisely how Travelers interpreted the policy during the claims process.

In a note dated September 28, 2015, Adam McClure, Travelers' claims adjuster, noted:

> CP received request form [sic] insured, letter dated 9/18/15 and in file cabinet for review. Insured attached legal paperwork that was filed against the insured by one of their subcontractors as well as a letter requesting that Travelers assign the insured's rights over to the subcontractor.
>
> This CP sent official legal referral of claim legal for official opinion on 9/24/15. On 9/25/15, this CP spoke with claim legal representative regarding the claim and the request. Claim legal indicated that we should say NO to their request to assign the claim over the [sic] subcontractor. Claim Legal rep indicated that they [sic] insured can transfer their claim over to the sub if they choose and no permission or assistance is needed from Travelers for them to do so. Claim Legal rep explained that <u>the policy is seen as separate from the claim and the insured has the right to transfer a claim,</u> whether paid or not over to anyone else they see fit. <u>The transfer of the policy is different and it is not something that Claim Legal advised we do.</u> Claim Legal rep advised this CP to draft a letter to respond to the request just explaining that we have reviewed their request and we do not consent to their request to transfer/assign the policy over to the sub.

(Dkt. 44-1 at 19, emphasis added.) Even Travelers saw the assignment of the Policy as distinct from the assignment of a claim. Thus, ESI could not assign its rights under the Policy to 3 Kings and thereby allow another entity to step into its shoes, so to speak, but ESI could enter into an agreement whereby whatever proceeds it received were the property of 3 Kings, in an effort to pay the costs of remediating the damage caused by the floating UST.

That is precisely what ESI and 3 Kings did. The settlement agreement between ESI and 3 Kings set forth that ESI and 3 Kings would enter into a settlement of the claims

among them, which concerned payment owed to 3 Kings for labor and materials, and the two entities would cooperate in a lawsuit against Travelers. (Dkt 43-15.) Section 8 of the agreement provided that ESI would pay over to 3 Kings any money paid by Travelers to ESI on account of the prosecution of the claims under the joint prosecution agreement. (Dkt. 43-15 at 2.) The joint prosecution agreement concerned itself with the recovery of damages arising from the "Float Incident." But nowhere in the settlement agreement did ESI assign its rights and duties under the Policy to 3 Kings – ESI at all times remained the policy holder and no assignment of the Policy itself occurred.

Accordingly, the Court finds no merit to Travelers' argument, and finds that the plain language of the Policy did not prohibit ESI from assigning its right to payment to 3 Kings in the event of a recovery. The Court therefore does not reach ESI's remaining arguments, and finds summary judgment is properly granted to ESI on its claim.

ESI claims also a right to attorney fees under Idaho Code § 41-1839. That provision states:

> (1) Any insurer issuing any policy, certificate or contract of insurance, surety, guaranty or indemnity of any kind or nature whatsoever that fails to pay a person entitled thereto within thirty (30) days after proof of loss has been furnished as provided in such policy, certificate or contract, or to pay to the person entitled thereto within sixty (60) days if the proof of loss pertains to uninsured motorist or underinsured motorist coverage benefits, the amount that person is justly due under such policy, certificate or contract shall in any action thereafter commenced against the insurer in any court in this state, or in any arbitration for recovery under the terms of the policy, certificate or contract, pay such further amount as the court shall adjudge reasonable as attorney's fees in such action or arbitration.

Neither party provided argument regarding ESI's claim for attorney fees in its briefing. Regardless, the Court finds the matter to be premature at this stage, and makes no finding at this time. An appropriate motion for attorney fees may be filed later in these proceedings pursuant to Fed. R. Civ. P. 54 and Dist. Idaho L. Civ. Rule 54.2.

ESI is therefore entitled to summary judgment with regard to its assertion of breach of contract damages in the amount of $177,431.99.

**4.      Negligence – Unfair Claims Settlement Practices Act**

ESI's third cause of action for negligence seeks to recover tort damages against Travelers for alleged statutory violations of the minimum standards of care under Idaho's Unfair Claims Settlement Practices Act, Idaho Code § 41-1329 ("UCSPA").

Travelers asserts that, because all of the conduct here, including the claims handling, occurred in Oregon, Oregon law should apply to this claim, and Oregon does not recognize such a claim under its version of the UCSPA. ESI argues Idaho recognizes a private right of action under Idaho's UCSPA. In response, Travelers contends that, even if Idaho law does apply, ESI cannot establish that Travelers violated Idaho's UCSPA.

The Court finds the parties' choice of law and substantive arguments are irrelevant with regard to ESI's third claim for negligence under Idaho's UCSPA, because there is no conflict between the two states' laws. Neither Idaho nor Oregon recognizes a private

right of action under the UCSPA. Absent a conflict, there is no need for the Court to

engage in a choice of law analysis.[23]

In *White v. Unigard Mut. Ins. Co.*, 730 P.2d 1014 (Idaho 1986), the Idaho

Supreme Court held that Idaho's UCSPA "does not give rise to a private right of action

whereby an insured can sue an insurer for statutory violations committed in connection

with the settlement of the insured's claim." *White*, 730 P.2d at 1021. Oregon law also

precludes a private cause of action for violation of its version of the UCSPA. *Richardson*

*v. Guardian Life Ins. Co. of Am.*, 984 P.2d 917, 923 (Or. Ct. App. 1999) (dismissing

claim for violation of the Unfair Claims Settlement Practices Act on summary judgment

because violations of the Act are not independently actionable).

Accordingly, Travelers is entitled to summary judgment with regard to ESI's third

cause of action for negligence under Idaho's UCSPA. ESI's corresponding motion

seeking summary judgment on its claim for negligence will be denied.

**5.      Breach of Implied Covenant of Good Faith and Fair Dealing**

ESI's second cause of action alleges breach of the covenant of good faith and fair

dealing. Initially, Travelers applied Idaho law to ESI's bad faith claim. But, both parties

later advanced a choice of law analysis, with Travelers asserting Oregon law should

---

[23] At the hearing, both parties conceded that neither Oregon nor Idaho recognized a private right of action under the UCSPA. ESI explained that it looked to the UCSPA as an alternative to pleading the tort of bad faith.

apply, while ESI contended Idaho law should apply.[24] The briefs did not identify the

conflict between Oregon and Idaho law with respect to the tort of bad faith, a prerequisite

for engaging in a choice of law analysis.

Idaho clearly recognizes that the tort of bad faith exists independent of a claim for

breach of contract against an insurer. *White*, 730 P.2d at 1020 (holding that a common

law tort action exists, distinct from an action on the contract, for an insurer's bad faith in

settling the first party claims of its insureds). Oregon courts adhere to the principle that

"an insurer's bad faith refusal to pay policy benefits to its insured sounds in contract and

is not an actionable tort in Oregon." *Braun-Salinas v. Am. Family Ins. Grp.*, No. 3:13-

CV-00264-AC, 2014 WL 1333731, at *8 (D. Or. Apr. 1, 2014), *aff'd*, 665 F. App'x 576

(9th Cir. 2016) (quoting *Employers' Fire Ins. v. Love It Ice Cream*, 670 P.2d 160 (Or. Ct.

App.1983)); *see also Santilli v. State Farm Life Ins. Co.*, 562 P.2d 965, 969 (Or. 1977)

("In cases involving the insurer's duty to pay under polices for theft, fire, health,

disability or life insurance, the unique relationship which gives rise to the special duty of

---

[24] Travelers, in its initial brief, did not discuss the choice of law analysis until Section C,
which was limited to ESI's negligence claim under the UCSPA. Mem. at 16 – 17. (Dkt. 27.)
There is no mention by Travelers of the applicable state law in Section B, which discussed ESI's
bad faith claim, and Travelers cited Idaho law. Mem. at 14-15. (Dkt. 27.)  In Travelers combined
response and reply to ESI's motion, Travelers, for the first time, presents a choice of law analysis
with regard to ESI's bad faith claim, and contends Oregon law applies. Travelers' Combined
Response and Reply at 13. (Dkt. 42.) In ESI's memorandum in support of its motion for
summary judgment, ESI argues Idaho law applies to both its bad faith claim (and its negligence
claim under Idaho's UCSPA), but suggests—without identifying—there is a conflict between the
two states with regard to the recognition of a tort claim against an insurer. ESI Mem. at 8. (Dkt.
31.)

liability insurers to attempt to settle within their policy limits does not arise.")).[25]

Accordingly, a conflict exists between Idaho and Oregon law with regard to ESI's bad faith claim.

However, the mere fact a conflict exists does not compel the Court to engage in a conflict of laws analysis under the facts here.[26] Although the tort of bad faith is not equivalent to a breach of contract claim under Idaho law, to find that Travelers committed bad faith in handling (and denying) ESI's claim, there must also have been a duty under the contract that was breached. *Harmon v. State Farm Mut. Auto. Ins. Co.*, 394 P.3d 796, 804 (Idaho 2017); *Robinson v. State Farm Mut. Auto. Ins. Co.*, 45 P.3d 829, 834 (Idaho 2002) ("Although the tort of bad faith is not a breach of contract claim, to find that the insurer committed bad faith there must also have been a duty under the contract that was breached."). Consequently, both the breach of contract claim and the bad faith claim depend upon the provisions of the Policy. *Weinstein v. Prudential Prop.*

_____

[25] The Court notes that, in other contexts such as the duty to defend, Oregon recognizes that an insurer steps into the role of a fiduciary, and would allow a claim for bad faith. *See Strader v. Grange Mut. Ins. Co.*, 39 P.3d 903, 906 (Or. Ct. App. 2002) ("[T]he relationship between an insurer and its insured is special with respect to the insurer's performance of its duty to defend, so that negligent performance of that duty gives rise to a tort claim, but the same relationship is not special with respect to the insurer's refusal to settle within policy limits, which sounds only in contract; in the former context, the insurer is in something resembling a fiduciary role, whereas in the latter it and the insured are adversaries.").

[26] A federal district court sitting in diversity must apply the forum state's choice of law rules to determine the controlling substantive law. *Cornelius v. DeLuca*, 709 F. Supp. 2d 1003, 1014 (D. Idaho 2010) (citing *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005)). Idaho applies the "most significant relation test" as set forth in the Restatement (Second) Conflict of Laws § 145 to determine the applicable law. *Grover v. Isom*, 53 P.3d 821, 823–24 (Idaho 2002).

& *Cas. Ins. Co.*, 233 P.3d 1221, 1237 (Idaho 2010); *see also Green Technology Lighting Corp. v. Liberty Surplus Ins. Corp.*, No. 1:17-cv-00432-DCN, 2018 WL 1053529 at *4 (D. Idaho Feb. 26, 2018) (noting that, although the tort claim for bad faith was separate from the contract claim under the insurance policy, "resolution of the claim will require interpretation of the Policy.").

In *Allis-Chalmers Corp. v. Lueck*, the United States Supreme Court explained that a bad-faith claim is dependent upon the terms of the agreement between the parties, and is merely a mechanism for pleading a type of contract violation to claim exemplary damages not otherwise recoverable. *Allis-Chalmers Corp.*, 471 U.S. 202, 217 (1985). *See also The Home Ins. Co. v. Serv. Am. Corp.*, 654 F.Supp. 157, 158-59, (N.D. Ill. 1987); *Kvaerner IHI v. Nat'l Union Fire Ins. Co. of La.*, No. 10-CV-00278, 2013 WL 6244167 *4 (W.D. La. Dec. 2, 2013) (bad faith claim "inextricably intertwined" with contract). As a result of that dependency, an "unnecessarily confusing situation would result if the law of one state is used to interpret the insurance agreement regarding the breach of contract claim and the law of a second state is applied to interpret the same agreement with regard to the bad faith claim." *Home Ins. Co.*, 654 F.Supp. at 159; *Kvaerner IHI*, 2013 WL 6244167 at *4; *Commerce & Industry Ins. Co. v. U.S. Bank Nat'l Assoc.*, No. 07 Civ. 5731(JGK), 2008 WL 4178474 at *4 (S.D.N.Y. Sept. 3, 2008).

Both parties agree Idaho law governs ESI's breach of contract claim. And, at the outset, Travelers relied upon Idaho law to assert ESI's bad faith claim was subject to dismissal upon summary judgment. Accordingly, the Court finds Idaho law governs both the contract and bad faith claims, and declines to apply Idaho's choice of law rules.

Turning to the merits,[27] for a first-party insured to recover on a bad faith claim under Idaho law, the insured must show: "1) the insurer intentionally and unreasonably denied or withheld payment; 2) the claim was not fairly debatable; 3) the denial or failure to pay was not the result of a good faith mistake; and 4) the resulting harm is not fully compensable by contract damages." *Dave's Inc. v. Linford*, 291 P.3d 427, 436 (Idaho 2012) (quoting *Robinson*, 45 P.3d at 832). A party claiming extra-contractual damages for insurance bad faith "must either prove that the insurer has 'intentionally and unreasonably' denied or delayed payment, provided the other elements are met." *Harmon*, 394 P.3d at 804 (quoting *Weinstein v. Prudential Prop. and Cas. Ins. Co.*, 233 P.3d 1221, 1270 (Idaho 2010)). However, "[a]n insurer does not commit bad faith when it challenges the validity of a 'fairly debatable' claim, or when its delay results from honest mistakes." *Vaught v. Dairyland Ins. Co.*, 956 P.2d 674, 679 (1998) (quoting *White*, 730 P.2d at 1018)) Likewise, when a claim involves a legal question of first impression, an insurer does not commit bad faith by litigating the claim even if the insurer does not prevail. *Id.* (citing *Squire v. Exchange Ins. Co.*, 775 P.2d 143, 145 (Idaho Ct. App. 1989)). The insured has the burden of showing that the claim was not fairly debatable. *Robinson*, 45 P.3d at 832

The central issue here is whether ESI's claim was reasonably in dispute, thereby rendering the claim fairly debatable. *See, e.g., Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1280–81, 31 Cal.Rptr.2d 433, 439 (1994) ("[t]he mistaken

---

[27] Because the Court finds ESI is entitled to summary judgment on its breach of contract claim regarding coverage, the merits of the bad faith claim may be addressed.

withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability."). Travelers argues the claim was fairly debatable under the terms of the Policy. In contrast, ESI argues the claim was not fairly debatable, because an adequate investigation was not conducted before Travelers denied the claim. ESI relies upon Travelers denial of its claim on February 25, 2015, one day after receiving the Vertex report on February 24, 2015, which indicated it was unclear how much ballast was in the UST. In response, Travelers asserts its claims adjuster, Adam McClure, attempted to discern the amount of ballast in the UST at the time of loss, but because the repair had been completed at the time the claim was submitted, it was not possible to do so. Thus, other than 3 Kings' delivery ticket that documented three truckloads of water had been delivered, and witnesses reporting the UST was half-full, no one really knew how much water was contained within the UST at the time it floated.

Here, there is evidence to support Travelers' contention that ESI's claim was reasonably in dispute. Travelers discharged its contractual obligations to ESI by promptly acknowledging and investigating the claim. ESI, by contesting the adequacy of the investigation, asserts Travelers acted unreasonably in denying the claim. However, the Court notes that, at the time of the investigation, the loss had been remediated, thereby hampering Travelers's investigation. The investigation concerned how much ballast was in the UST, and whether the manufacturer's installation process was followed.

ESI does not dispute that the parties disagreed as to the amount of ballast in the UST, and its sufficiency, which no one at the time could determine with any certainty.

The parties disagreed also concerning the installation process. The Vertex report was ultimately inconclusive, and ESI does not explain what further information Travelers should have or could have obtained to resolve the unanswered questions set forth in the Vertex report. Under these facts, the Court cannot conclude that Travelers's investigation was unreasonable based upon the information available at the time the claim was tendered to it. The fact that Travelers did not prevail here does not detract from the reasonableness of Travelers's conduct at the time the loss was evaluated and the claim denied.

Accordingly, with regard to the bad faith claim, ESI's motion will be denied and Travelers's motion will be granted.[28]

---

[28] ESI explained at the hearing that, if the Court did not award damages under its breach of contract claim, ESI sought to recover its damages pursuant to its bad faith claim. However, as explained above, a finding of a breach of a contractual duty is a prerequisite to consideration of a bad faith claim, and there must be a finding also that contract damages are insufficient to fully compensate the insured. Even if the Court had granted ESI's motion on its bad faith claim, the issue of damages would have remained, because the question whether ESI's contract damages were insufficient was not an issue presented to the Court.

# CONCLUSION

In light of the foregoing analysis and the record herein, the Court concludes that the motions should each be granted in part and denied in part. With regard to ESI's first cause of action for breach of contract, the Court finds there was coverage under the Policy for ESI's claim.[29] Accordingly, ESI's motion will be granted, and Travelers' motion denied. ESI did not carry its burden with regard to its second cause of action for breach of the implied covenant of good faith and fair dealing. Travelers's motion will therefore be granted as to ESI's second cause of action and ESI's motion denied. As for ESI's third cause of action for negligence, ESI's motion will be denied and Travelers' motion will be granted. There is no private right of action under Idaho Code § 41-1329 (or Oregon's statutory counterpart). And finally, ESI separately moved for summary judgment with regard to the reasonableness of its damages. The Court finds summary judgment appropriate in favor of ESI, as Travelers did not contest or challenge the amount, either during the claims process or upon summary judgment. The Court reserves the right to consider a request for attorney fees at a later date.

Because the Court has resolved the issue of both coverage and damages, ESI will be awarded judgment in the amount of $177,431.99. A separate form of judgment will be entered. ESI may later move to amend the judgment to account for any additional sums,

---

[29] Although not separately argued in ESI's motion for summary judgment, the Court's finding of coverage would necessarily result in a finding that ESI is entitled to declaratory relief, which ESI plead in its fourth cause of action. Compl. ¶¶ 37-43. (Dkt. 1.)

including prejudgment interest pursuant to Idaho Code § 28-22-104 or attorney fees, if awarded.

## **ORDER**

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)    Plaintiff's Motion for Summary Judgment (Dkt. 30) is **GRANTED IN PART AND DENIED IN PART.**

2)    Defendant's Motion for Summary Judgment (Dkt. 26) is **GRANTED IN PART AND DENIED IN PART.**

3)    A separate judgment will be entered under Fed. Rule Civ. P. 58.

DATED: June 18, 2018

Honorable Candy W. Dale
United States Magistrate Judge