UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ENGINEERED STRUCTURES, INC., a corporation of Idaho, an Idaho corporation,<br><br>Plaintiff,<br><br>v.<br><br>TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut corporation,<br><br>Defendant. | Case No. 1:16-cv-00516-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

### INTRODUCTION

This case involves a dispute regarding the interpretation and application of a builder's risk insurance policy issued by Travelers Property Casualty Company of America ("Travelers") to Engineered Structures, Inc. ("ESI"). The parties filed cross-motions for summary judgment. (Dkt. 26, 30.) After a hearing, the Court entered a memorandum decision and order on June 18, 2018, granting in part and denying in part each motion. Both parties appealed. The matter is now before the Court upon remand. (Dkt. 61, 62.)

**MEMORANDUM DECISION AND ORDER - 1**

To facilitate consideration of the limited issues on remand, the parties were given an opportunity to submit simultaneous briefs and replies thereto. Both parties availed themselves of the opportunity to do so. (Dkt. 64 – 67.) Having fully reviewed the record and the parties' briefing, the Court finds that oral argument would not significantly aid the decision-making process. Accordingly, the matter will be decided on the record before the Court without oral argument. Dist. Idaho L. Rule 7.1(d).

## BACKGROUND[1]

On September 29, 2014, ESI entered into a contract with Fred Meyer Stores, Inc., to build the Burlingame Fred Meyer Fuel Center in Multnomah County, Portland, Oregon, which was to be a new multi-island fueling station and associated retail space (the Project). The Contract called for installation of two underground storage tanks ("USTs") for storage and sale of fuel in the anticipated Fred Meyer fueling station. One UST had a 20,000-gallon capacity designed to hold regular unleaded fuel, and the other was a split 18,000-gallon tank designed to hold both premium and diesel fuel.

A component of the Project involved installation of the Liquid Fuel Distribution & Electrical systems, a portion of which work included the installation of the two USTs. In mid-December of 2014, ESI and its subcontractors began the process of installing the two USTs on the Project. The project manual specified that the contractor deliver, handle and install materials (including specifically the USTs) in accordance with the manufacturer's

---

[1] The Court is not asked to make further factual findings upon remand. The undisputed facts are well known to the Court and the parties, and therefore will not be repeated in full here. What follows is a brief recitation of the salient facts for consideration on remand, taken directly from the Court's prior Memorandum Decision and Order. (Dkt. 46.)

**MEMORANDUM DECISION AND ORDER - 2**

instructions. Xerxes manufactured the USTs, and the Xerxes Installation Manual set forth the sequential steps for their installation.

Between December 15 and 17, 2014, the two USTs were lowered into a shored excavation, seated into bedding material, strapped down via anchor straps to deadmen (reinforced concrete beams) on either side of the USTs, and partially backfilled with pea gravel, per the Xerxes manual. The backfill material was placed in the hole at least 75 percent of the way up the tank. The 20,000 gallon UST was about half filled with water as ballast (about 10,000 gallons) at that time. Post-installation testing, which included soaping the fittings to ensure the UST could hold pressure, had not been completed.

On December 23, 2014, it began to rain. On the morning of December 24, 2014, ESI discovered that the 20,000 gallon UST had displaced the surrounding soils and emerged from the excavation. Approximately 1.85 inches of rain had fallen over the period of time that the UST was placed in the ground to the time it floated. At that time, the backfill was at least up to the top of the tank, and the UST was between stages; that is, the UST had been lowered into the excavation and partially backfilled, but it had not yet successfully undergone post-installation testing as required by the Xerxes Installation Manual. Also, the ballasting of the tank was incomplete. In other words, as of the date of loss, the tank installation was incomplete, as was the Project as a whole.

ESI incurred additional costs and expenses to re-excavate the hole and reinstall the UST in the excavated hole. On January 6, 2015, ESI submitted a claim under its builders' risk policy with Travelers for the loss and associated Project repairs, including reinstallation of the UST and other resulting costs.

**MEMORANDUM DECISION AND ORDER - 3**

Travelers denied the claim, relying upon the policy exclusion for faulty workmanship:

> **B. EXCLUSIONS**
> * * *
> 4. We will not pay for loss or damage caused by or resulting from faulty, inadequate or defective:
> ***
> b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading or compaction;
> ***
> If an excluded cause of loss listed in Paragraph 4.a. through 4.d. above, results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss.

Travelers' denial letter explained, in part: "The referenced Builders' Risk policy does not cover the faulty, inadequate or defective-planning, workmanship or construction involved in properly installing the fuel tanks. After a thorough investigation it was determined that the subcontractor did not follow installation specifications from the fuel tank manufacturer relating to the amount of ballast to be used…." Both parties agree that ESI was required to follow the Xerxes manufacturer's installation instructions for wet-hole installation of the USTs as set forth in the Xerxes Installation Manual.

The Court found the Policy Exclusion was not applicable, and granted summary judgment to ESI on its breach of contract claim. The Court also granted summary judgment to Travelers on ESI's bad faith claim. The United States Court of Appeals for the Ninth Circuit affirmed in part and reversed in part, and remanded the matter to the Court for further consideration. The Circuit affirmed the Court's grant of summary judgment to Travelers, finding that ESI's evidence was not enough to show more than the existence of a "legitimate question or difference of opinion over the eligibility, amount or

**MEMORANDUM DECISION AND ORDER - 4**

value of the claim." But, it reversed the Court's grant of summary judgment to ESI on its breach of contract claim.

The Circuit found that the Court and the parties incorrectly focused previously on the term "workmanship" to find the Exclusion ambiguous and inapplicable, and failed to consider the Exclusion's "unambiguous, process-oriented use" of the term "construction." The Ninth Circuit construed the term "construction" in the Exclusion as a term referring to the "process of completing the project rather than a defect in the final product being built." The Circuit directed the Court to resolve "whether ESI's losses were, in fact, 'caused by or result[ed] from faulty, inadequate or defective . . . construction,' thus making the Exclusion applicable."

Because the Ninth Circuit remanded for further proceedings regarding application of the Exclusion, it addressed also this Court's references to the Policy's provision on "resulting loss or damage." The Circuit held that the "resulting loss or damage" provision does not contain an anti-concurrent causation clause, so the Exclusion would not bar coverage for all of ESI's damages if faulty construction was one factor among others causing the underground storage tank's floatation. However, the Circuit found ESI's argument that the resulting loss or damage provision would reinstate coverage for all damages other than the cost of additional ballast water needed to prevent floatation untenable. The Ninth Circuit directed the Court to resolve whether an "'excluded cause of loss' did, in fact, 'result[] in a Covered Cause of Loss'; and, if so, the scope of the 'resulting loss or damage' provision.

**MEMORANDUM DECISION AND ORDER - 5**

## ANALYSIS

The Ninth Circuit held that the term "construction" as used in the Exclusion is an unambiguous term referring to the process of constructing something. Therefore, the determination of the Policy Exclusion's meaning and legal effect is a question of law. *Mintun v. Blades*, 2008 WL 711636, *16 (D. Idaho 2008). According to the plain meaning of the policy language, the construction process itself must be "faulty, inadequate, or defective" for the exclusion to apply. *Fisher v. Garrison Prop. & Cas. Ins. Co.*, 395 P.3d 368, 373 (Idaho 2017). "[T]he word 'construction' when used as a noun means: 1. the process or act of constructing or manner in which a thing is constructed 2. the thing constructed; a structure. To 'construct' something is 'to put together substances or parts, esp systematically, in order to make or build (a building, bridge, etc); assemble.'" *Fisher*, 395 P.3d at 373–74.

Both parties agree the Xerxes Installation Manual sets forth the process for installing the USTs. The manual cautions that a UST is not adequately protected against flotation until the tank is fully backfilled and the top slab is in place. The manual instructs that the tank should be "ballasted completely after the backfill is at least 75 percent of the way up the tank and after post installation testing has been successfully completed." The sequence describes two steps that must occur before ballasting the UST completely: backfill 75 percent, and post installation testing. The manual further instructs that the ballast level in the tank must "either be lower than the backfill material or less than 12 inches above the water level in the hole" to maintain equilibrium. Xerxes Manual § 5.3.7. (Dkt. 65-5 at 13.) The manual states that the installer must pump water from the

**MEMORANDUM DECISION AND ORDER - 6**

excavation hole and attempt to maintain the water level below the top of the bedding materials until the tank can be fully backfilled and ballasted. Xerxes Manual § 5.3.3.1. (Dkt. 65-5 at 13.)

The Court previously found no dispute that, prior to the date of loss, the USTs had been lowered into the excavated hole and partially backfilled, but had not yet undergone post-installation testing as required by the Xerxes Installation Manual. Although no one knew precisely how much ballast was in the tank, Travelers concedes, and the undisputed facts establish, that the UST that later floated was about half filled with water as ballast (about 10,000 gallons) by December 17, 2014.

During the ensuing investigation after the loss occurred, Traveler's expert, Vertex, concluded that, as of December 15, 2014, the "excavation was partially backfilled. The UST was not completely backfilled because product conveyance piping on top of the tank was going to be installed at a later date." Thus, the Court found previously that: (1) there was no factual dispute that ballasting of the tank was incomplete at the time of the flood on December 24, 2014; and (2) another step in the sequence had to occur before the UST could be fully ballasted.

Travelers now contends, however, that the construction process was faulty because ESI prematurely removed the dewatering pumps used to dry out the excavation pit and maintain equilibrium during the wet-hole installation process, and failed to ensure that the UST was fully ballasted once backfill reached the top of the tank. And, although Travelers admits the Xerxes manual controls, Travelers points to other documents it contends demonstrate ESI did not adhere to the correct process, such as the Fred Meyer

**MEMORANDUM DECISION AND ORDER - 7**

installation checklist, a drawing prepared by Leonard Petroleum, and a leading industry treatise.[2] Travelers claims that the Leonard Petroleum drawing contains a note directing that, if groundwater is encountered during excavation for tank installation, contractor must "back fill to top of tanks immediately after tank placement, then contractor shall entirely fill tanks with water…in one continuous process." Traveler's arguments are unavailing.

With respect to the first contention – that ESI pulled the dewatering pumps prematurely – Travelers justifies its decision to deny coverage with the benefit of 20/20 hindsight. There is no dispute that ESI pulled the dewatering pump prior to the date of loss. Brandon McCurdy testified in his deposition that, "[a]fter we felt that we had ballast high enough for — groundwater conditions, Bill Elliott with 3 Kings instructed Kerr to— they can go ahead and pull the pump." (Dkt. 43-5 at 2.) Although it is not clear from the record when the pump was pulled, there is no dispute that the tanks sat, without incident, from December 15 until December 24, the date of loss. Yet, now Travelers argues that ESI should have anticipated the heavy rainfall, and that but for the failure to completely fill the tank with ballast, it would not have floated. Supp. Reply at 4. (Dkt. 66.)

Traveler's argument is premised upon anticipation of a significant rain event, enough to overcome the existing ballast in the tank, such that ESI as a precautionary measure should have left the dewatering pumps in the hole and/or filled the tanks

---

[2] Travelers previously raised the argument that other documents governed the installation process, but this is the first time that it has cited to an outside treatise. (*See* Dkt. 27 at 6, identifying the project checklist and drawings prepared by Leonard Petroleum.)

**MEMORANDUM DECISION AND ORDER - 8**

completely with ballast at some point prior to or during the rainfall that began the night of December 23. But Traveler's argument fails to create a genuine dispute of material fact concerning the construction process that ESI followed simply because, with the benefit of 20/20 hindsight, ESI should have left the dewatering pump in place and/or fully ballasted the tank in anticipation of heavy rainfall on the night of December 23. Accordingly, Traveler's argument does not upset the Court's finding that it was undisputed the process of ballasting had not yet been completed because other steps were required beforehand.

Turning to Traveler's second contention — that the tank should have been fully ballasted — this is in direct contravention to the undisputed facts and the installation process set forth in the Xerxes manual. The Court previously found the facts undisputed, as discussed above, that the excavated hole was partially backfilled, and that post-installation testing had not occurred. Brandon McCurdy testified also that the backfill was only 75% of the way up the tank. (Dkt. 43-5 at 4.) The Xerxes manual instructs that the tanks "must be air tested after backfill is brought close to the top of the tank." Xerxes manual § 13.2.2. (Dkt. 65-5 at 23.) The manual further instructs that the tank should be ballasted completely once post installation testing is complete. Xerxes manual § 12.1.1 (Dkt. 65-5 at 22.) Traveler's own expert acknowledged that the UST was not completely backfilled because post-installation testing had not been completed prior to the date of loss. In other words, all of the sequential steps required before the UST could be

completely ballasted were not yet completed at the time of the flood event on December 24, 2014. Traveler's argument circumvents the process set forth in the Xerxes manual.[3]

Accordingly, the Court finds that Travelers cannot prove, as a matter of law, that the Policy Exclusion applicable to faulty, inadequate, or defective construction applies. Therefore, Travelers' failure to cover the loss constitutes a breach of contract, and there is no need for the Court to consider the resulting loss provision. Summary judgment will again be entered in favor of ESI on its breach of contract and contract damages claims.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)  Plaintiff's Motion for Summary Judgment (Dkt. 30) is **GRANTED IN PART AND DENIED IN PART**.

2)  A separate judgment will be entered under Fed. R. Civ. P. 58.

DATED: May 28, 2021

Honorable Candy W. Dale
United States Magistrate Judge

---

[3] The Court notes there is no evidence in the record that, had the tank been fully ballasted, the loss would have been prevented.